UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| COMMODITY FUTURES TRADING COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>Uduakobong Udo Inyangudo a/k/a Alexander Uti Bassey, Vanessa B. Okocha, Amen M. Okundaye, Charles A. Ochi, Diego I. Okeh, Daniell N. Liggins, Victor O. Edeh, and Tochukwu Edeh,<br><br>Defendants. | Case No. 1:21-cv-11615<br><br>ECF Case |

**ORDER FOR FINAL JUDGMENT BY DEFAULT, PERMANENT INJUNCTION, CIVIL MONETARY PENALTY, AND OTHER STATUTORY AND EQUITABLE RELIEF AGAINST DEFENDANT TOCHUKWU EDEH**

### I.   Introduction

1. On September 30, 2021, the Commodity Futures Trading Commission ("Commission" or "Plaintiff") filed its Complaint for Injunctive and Other Equitable Relief, Restitution, and Civil Monetary Penalties and Other Equitable Relief, Under the Commodity Exchange Act and Commission Regulations against Defendants Uduakobong Udo Inyangudo a/k/a Alexander Uti Bassey, Vanessa B. Okocha, Amen M. Okundaye, Uduakobong Udo Inyangudo a/k/a Alexander Uti Bassey, Vanessa B. Okocha, Daniell N. Liggins, Victor O. Edeh, and Tochukwu Edeh ("T Edeh"), alleging that they violated the Commodity Exchange Act ("Act") and Commission Regulations ("Regulations").  ECF 1.

2. Plaintiff has filed a Motion for Entry Default Judgment Against T. Edeh for violating the Act and Regulations, specifically 7 U.S.C. §§ 6b(a)(2)(A), (C) and 9(1), and 17

C.F.R. § 180.1(a)(1), (3) (2022) ("Motion").

3. On December 10, 2021, the Clerk of the Court entered the default of T Edeh. ECF 24.

4. Therefore, the Court having carefully considered the Complaint, the allegations of which are well-pleaded and hereby taken as true, the Commission's Motion, the record in this case, and being otherwise fully advised in the premises, it is hereby:

**ORDERED** that Plaintiff's Motion is **GRANTED**. Accordingly, as to T Edeh, the Court enters findings of fact, conclusions of law, and an Order of Final Judgment by Default for Permanent Injunction, Civil Monetary Penalties, and Other Statutory and Equitable Relief ("Order") pursuant to 7 U.S.C. § 13a-1, as set forth herein.

## II. FINDINGS OF FACT

A. **Parties**

5. The U.S. Commodity Futures Trading Commission is an independent federal regulatory agency that is charged by Congress with the administration and enforcement of the Act, 7 U.S.C. §§ 1-26 and the Commission's Regulation, 17 C.F.R. §§ 1.1-190 (2023). The Commission maintains its principal office at Three Lafayette Centre, 1155 21st Street, N.W., Washington, D.C. 20581.

6. From approximately June 2016 through approximately February 2019 (the "Relevant Period"), T Edeh was a resident of Jacksonville, Florida. T Edeh has never registered with the Commission in any capacity.

B. **Facts**

A. **Summary**

7. During Relevant Period, all defendants in this case, acting through, or in

2

conjunction with, the web-based entity primefx.org a/k/a Prime FX Managed System a/k/a PrimeFX Managed System Ltd. a/k/a Global Prime a/k/a Global Prime FX ("Prime FX"), fraudulently solicited and misappropriated funds from U.S. and international customers, as part of a coordinated scheme, for purported trading in foreign currency ("Forex") and Bitcoin. During the Relevant Period, all defendants engaged in coordinated efforts to obtain and misappropriate more than $1.2 million from at least 106 customers ("Prime FX Customers") through fraudulent solicitations.

8. All defendants used misappropriated funds for living expenses, travel, and entertainment, among other things. All defendants also distributed these funds amongst one another as part of a joint, fraudulent enterprise. As a result, Prime FX Customers have lost most, if not all, of their funds due to defendants' frauds and misappropriations. T Edeh misappropriated some Prime FX Customer funds, as discussed further below.

**B.   Prime FX Solicitations**

9. Prime FX was once a registered corporation in the United Kingdom. PrimeFX Managed System Ltd. was registered as a company in the UK in September 2018 and dissolved in February 2020. But Prime FX was never formally established as a business entity in the United States. Instead, Prime FX operated as a website with a domain registered at a New York address, primefx.org, that made false and misleading representations regarding trading Forex and Bitcoin. Emails from care@primefx.org, directed customers to deposit their funds into defendants' bank accounts.

10. During the Relevant Period, Prime FX operated primarily as a website, primefx.org, that offered trading in Forex and Bitcoin in managed accounts via online programs.

3

The website was supplemented with a sales brochure distributed to prospective customers via emails and social media.

11. During the Relevant Period, Prime FX falsely represented to the public in its solicitation materials that it had existed since 2012. The solicitation materials claimed that Prime FX had physical locations in Cyprus, Hong Kong, Australia, England, and Houston, Texas. Both the Prime FX website and brochure claimed its investment programs were regulated by the Cypress Securities and Exchange Commission ("CySEC") and showed a CySEC license number. However, that CySEC license number did not belong to Prime FX, CySEC did not regulate Prime FX and Prime FX did not have offices in the places listed above.

12. Prime FX solicited customers in several countries, including the United States, via its website and social media, and directly by emails attaching its brochure (collectively "solicitation materials"). Prime FX's agents used several aliases to solicit customers via social media and email. Prime FX also obtained investors from existing customers, who received referral fees.

13. During the Relevant Period, the care@primefx.org email account was a key element in the deception of Prime FX Customers and potential customers, as well as a primary tool used in the misappropriation of customer funds.

14. Prime FX Customers used primefx.org to log on and view their accounts. Nothing posted on the website was accurate, as no trades were ever made, nor profits actually earned. Primefx.org existed to solicit prospective customers under false pretenses to deposit funds and to have current customers send additional funds. The Prime FX brochure emailed to customers and prospective customers also made a variety of false and misleading statements.

15. Prime FX Customers relied upon the representations of trading and profit made on the primefx.org and in solicitation materials distributed via email. Prime FX Customers relied upon those representations and solicitation materials when they invested in Prime FX, which directed them to send funds to defendants, rather than, as would have been appropriate, an account held by Prime FX.

16. Prime FX also used a variety of false statements on social media to ensnare and deceive customers and potential customers. Prime FX Customers relied upon these social media exchanges and posts, which falsely claimed that Prime FX profitably traded its customers' funds.

C. **Prime FX Customers' Funds**

17. When Prime FX Customers and prospective customers asked why they should direct investments to third-party individuals instead of a business account, Prime FX's agents pointed to its purported "structure" in which "founding fund managers and active investors operated under their own individual operations." Alternatively, Prime FX agents also falsely responded that customers would transmit their funds directly to traders who would deposit such funds in Prime FX accounts for trading.

18. The emails sent from care@primefx.org to the Prime FX Customers and prospective customers, with the names of third-party individuals and their corresponding banking information, referred to the third-parties as "exchangers." Instructions given to the Prime FX Customers were to "Fill in Exchanger/beneficiary details correctly for wires to pull through successfully. Exchangers convey the funds to trading accounts."

19. These representations made to Prime FX Customers and prospective customers were false. The third-parties that received the trading deposits were not "founding fund

5

managers" or "independent investors," but rather the defendants in this case who carried out the Prime FX misappropriation scheme.

### D. T Edeh Misappropriated Prime FX Customers' Funds

20. During the Relevant Period, T Edeh received $5,000 on or about October 24, 2018 into his Wells Fargo bank account from one Prime FX Customer. As of October 23, 2018, the day before the Prime FX Customer transferred funds to T Edeh, there was a negative balance in T Edeh's account. After the $5,000 wire transfer from the Prime FX Customer, T Edeh immediately transferred the Customer's funds to an account held by Big T Autos, which T Edeh controlled.

21. During the Relevant Period, T Edeh received deposits of $127,000 into his Wells Fargo and SunTrust personal bank accounts from defendants Okundaye and Okocha, and from another Prime FX agent. These funds came from several Prime FX Customers who made deposits into accounts held by defendants Okundaye, Okocha and another agent of Prime FX, who each thereafter transferred the Customers' funds to T Edeh's accounts.

22. During the Relevant Period, T Edeh's Big T Autos Wells Fargo account received deposits of $79,890 from defendants Okundaye, Okocha, Okeh and another agent of Prime FX. These funds came from several Prime FX Customers who made deposits to accounts held by defendants Okundaye, Okocha, Okeh and another Prime FX agent, and thereafter transferred the Customers' funds to T Edeh's Big T Autos account.

23. One example of a Prime FX Customer's funds deposited with defendant Okocha and then transferred to T Edeh occurred in January 2018. On or about January 3, 2018, a Prime FX Customer wired $15,000 to Okocha's Bank of America account. Prior to the $15,000 wire, the balance in Okocha's account was less than $100. On or about January 10, 2018, Okocha

6

transferred $12,750 to T Edeh's Wells Fargo account. Between the time that Okocha received the Prime FX Customer's deposit and the time she transferred the deposit to T Edeh, Okocha's account received only smaller deposits of less than $500. Immediately upon receipt of these funds from Okocha, T Edeh transferred the same amount to his Big T Autos account. T Edeh did not return any funds to Prime FX Customers.

24. During the Relevant Period, T Edeh received a net total of $211,890 of Prime FX Customer funds. During the Relevant Period, T Edeh did not use the $211,890 of Prime FX Customer funds to trade Forex or Bitcoin on behalf of Prime FX Customers.[1]

### III. CONCLUSIONS OF LAW

#### A. Jurisdiction and Venue

25. This Court has jurisdiction over this action under 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1345 (district courts have original jurisdiction over civil actions commenced by any agency expressly authorized to sue by Congress). This Court also has jurisdiction over T Edeh and the subject matter of this action pursuant to 7 U.S.C. § 13a-1(a), which authorizes the Commission to seek injunctive relief against any person whenever it shall appear that such person has engaged in any act or practice constituting a violation of any provision of the Act or any rule, regulation, or order thereunder.

26. Venue properly lies with this Court pursuant to 7 U.S.C. § 13a-1(e) in that T Edeh transacted business in this district, and his acts and practices in violation of the Act occurred within this district, among other places.

---

[1] T Edeh's bank accounts show a withdrawal of only $298.04 to a cryptocurrency exchange during the Relevant Period. However, this $298.04 did not come from Prime FX Customers.

### B.    Fraud in Connection with Forex Contracts

27.    By misappropriating Prime FX Customer funds as described above, T Edeh cheated or defrauded or attempted to cheat or defraud and willfully deceived or attempted to deceive, in connection with the offering of, or entering into, off-exchange leveraged or margined forex transactions, in violation of 7 U.S.C. § 6b(a)(2)(A) and (C).

28.    By failing to disclose, and omitting, that he was misappropriating Prime FX Customer funds, T Edeh made or attempted to make untrue or misleading statements of material fact or omitted to state or attempted to omit material facts necessary in order to make statements made not untrue or misleading, in connection with contracts of sale of commodities in interstate commerce, in violation of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1), (3) (2023).

29.    Unless restrained and enjoined by this Court, there is a reasonable likelihood that T Edeh will continue to engage in the acts and practices alleged in the Complaint and in similar acts and practices in violation of the Act and Regulations.

### IV.    PERMANENT INJUNCTION

30.    Based upon and in connection with the foregoing conduct, pursuant to 7 U.S.C. § 13a-1, T Edeh is permanently restrained, enjoined and prohibited from directly or indirectly:

   a.    Cheating or defrauding, or attempting to cheat or defraud, or willfully deceiving or attempting to deceive, other persons in or in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery that is made, or to be made, for or on behalf of, or with, any other person in violation of 7 U.S.C. § 6b(a)(2)(A) and (C); and

   b.    making or attempting to make untrue or misleading statements of material fact or omitting to state or attempting to omit material facts necessary in order to make

8

statements made not untrue or misleading, in connection with contracts of sale of commodities in interstate commerce, in violation of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1), (3) (2023).

31. T Edeh is permanently restrained, enjoined and prohibited from directly or indirectly:

   a. Trading on or subject to the rules of any registered entity (as that term is defined in 7 U.S.C. § 1a(40));

   b. Entering into any transactions involving "commodity interests" (as that term is defined in 17 C.F.R. § 1.3 (2023)), for his own personal account or for any account in which he has a direct or indirect interest;

   c. Having any commodity interests traded on his behalf;

   d. Controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity interests;

   e. Soliciting, receiving or accepting any funds from any person for the purpose of purchasing or selling any commodity interests;

   f. Applying for registration or claiming exemption from registration with the Commission in any capacity, and engaging in any activity requiring such registration or exemption from registration with the Commission, except as provided for in 17 C.F.R. § 4.14(a)(9) (2023); and,

   g. Acting as a principal (as that term is defined in 17 C.F.R. § 3.1(a) (2023)), agent or any other officer or employee of any person (as that term is defined in 7 U.S.C. § 1a(38)), registered, exempted from registration or required to be registered with

the Commission, except as provided for in 17 C.F.R. § 4.14(a)(9) (2023).

## V. RESTITUTION AND CIVIL MONETARY PENALTY

### A. Restitution

32. T Edeh shall pay restitution in the amount of two hundred eleven thousand eight hundred ninety dollars ($211,890) ("Restitution Obligation"). If the Restitution Obligation is not paid immediately, post-judgment interest shall accrue on the Restitution Obligation beginning on the date of entry of this Order and shall be determined by using the Treasury Bill rate prevailing on the date of entry of this Order pursuant to 28 U.S.C. § 1961 (2020). In a related criminal action ("DOJ Action"), *United States v. Tochukwu Edeh*, 22-crim.-10293 (D. Mass.) (Nov. 1, 2023), this Court ordered T Edeh to pay restitution in the amount of two million five hundred ninety thousand eight hundred ninety-seven dollars and fifteen cents ($2,590,897.15) to Prime FX's Customers in connection with the same conduct at issue in this action.

33. T Edeh shall receive a dollar-for-dollar credit against his Restitution Obligation for any restitution or disgorgement actually paid in the DOJ Action. Within ten days of any payment in the DOJ Action, T Edeh shall, under a cover letter that identifies the name and docket number of this proceeding, transmit copies of the form of payment to the Chief Financial Officer, Commodity Futures Trading Commission, and Rick Glaser, Deputy Director, Commodity Futures Trading Commission, at 1155 21st Street, NW, Washington, D.C. 20581, and counsel of record in this proceeding for the DFPI.

34. If not offset by payments in the DOJ Action, any outstanding portion of T Edeh's Restitution Obligation and any post-judgment interest, shall be paid in accordance with the procedures set forth in in Paragraphs 37-43, below.

35. The amounts payable to each T Edeh customer shall not limit the ability of any

10

customer from proving that a greater amount is owed from T Edeh or any other person or entity, and nothing herein shall be construed in any way to limit or abridge the rights of any customer that exist under state or common law.

36. To the extent that any funds accrue to the U.S. Treasury for satisfaction of T Edeh's Restitution Obligation, such funds shall be transferred to the Monitor for disbursement in accordance with the procedures set forth below.

37. To effect payment of the Restitution Obligations and the distribution of any restitution payments to Prime FX Customers, the Court appoints the National Futures Association ("NFA") as Monitor ("Monitor"). The Monitor shall receive restitution payments from T Edeh and make distributions as set forth below. Because the Monitor is acting as an officer of this Court in performing these services, the NFA shall not be liable for any action or inaction arising from NFA's appointment as Monitor, other than actions involving fraud.

38. T Edeh shall make Restitution Obligation payments, and any post-judgment interest payments, under this Order to the Monitor in the name "T Edeh - Restitution Fund," and shall send such payments by electronic funds transfer, or by U.S. postal money order, certified check, bank cashier's check, or bank money order, to the Office of Administration, National Futures Association, 300 South Riverside Plaza, Suite 1800, Chicago, Illinois 60606, under cover letter that identifies him and the name and docket number of this proceeding. T Edeh shall simultaneously transmit copies of the cover letter and the form of payment to the Chief Financial Officer, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street, NW, Washington, D.C. 20581.

39. The Monitor shall oversee the Restitution Obligation and shall have the discretion to determine the manner of distribution of such funds in an equitable fashion to Prime FX

Customers identified by the Commission or may defer distribution until such time as the Monitor deems appropriate. In the event that the amount of Restitution Obligation payments to the Monitor are of a *de minimis* nature such that the Monitor determines that the administrative cost of making a distribution to Prime FX Customers is impractical, the Monitor may, in its discretion, treat such restitution payments as civil monetary penalty payments, which the Monitor shall forward to the Commission following the instructions for civil monetary penalty payments set forth in Part V.B below.

40.     T Edeh shall cooperate with the Monitor as appropriate to provide such information as the Monitor deems necessary and appropriate to identify their customers to whom the Monitor, in its sole discretion, may determine to include in any plan for distribution of any Restitution Obligation payments. T Edeh shall execute any documents necessary to release funds that they have in any repository, bank, investment or other financial institution, wherever located, in order to make partial or total payment toward the Restitution Obligation.

41.     The Monitor shall provide the Commission at the beginning of each calendar year with a report detailing the disbursement of funds to the customers of T Edeh during the previous year. The Monitor shall transmit this report under a cover letter that identifies the name and docket number of this proceeding to the Chief Financial Officer, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street, NW, Washington, D.C. 20581.

42.     To the extent that any funds accrue to the U.S. Treasury for satisfaction of the Restitution Obligation, such funds shall be transferred to the Monitor for disbursement in accordance with the procedures set forth above.

**B.      Civil Monetary Penalty**

43.     T Edeh shall pay a civil monetary penalty in the amount of four hundred twenty-

nine thousand twenty-eight dollars ($429,028) ("CMP Obligation"). If the CMP Obligation is not paid immediately, then post-judgment interest shall accrue on the CMP Obligation beginning on the date of entry of this Order and shall be determined by using the Treasury Bill rate prevailing on the date of entry of this Order pursuant to 28 U.S.C. § 1961.

44. T Edeh shall pay his CMP Obligations and any post-judgment interest by electronic funds transfer, U.S. postal money order, certified check, bank cashier's check, or bank money order. If payment is to be made other than by electronic funds transfer, then the payment shall be made payable to the Commodity Futures Trading Commission and sent to the address below:

> MMAC/ESC/AMK326
> Commodity Futures Trading Commission
> Division of Enforcement
> 6500 S. MacArthur Blvd.
> HQ Room 181
> Oklahoma City, OK 73169
> (405) 954-6569 office
> (405) 954-1620 fax
> 9-AMC-AR-CFTC@faa.gov

45. If he chooses payment by electronic funds transfer, T Edeh shall contact Marie Thorne or her successor at the address above to receive payment instructions and shall fully comply with those instructions. T Edeh shall accompany payment of his CMP Obligation with a cover letter that identifies the payor and the name and docket number of this proceeding. T Edeh shall simultaneously transmit copies of the cover letter and the form of payment to the Chief Financial Officer, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street, NW, Washington, D.C. 20581.

C. **Provision Related to Monetary Sanctions**

46. Partial Satisfaction: Acceptance by the Commission or the Monitor of any partial

payment of the Restitution Obligation or the CMP Obligation shall not be deemed a waiver of T Edeh's obligations to make further payments pursuant to this Order, or a waiver of the Commission's right to seek to compel payment of any remaining balance.

47. The amounts payable to each customer shall not limit the ability of any customer from proving that a greater amount is owed from T Edeh or any other person or entity, and nothing herein shall be construed in any way to limit or abridge the rights of any customer that exist under state or common law.

48. Pursuant to Rule 71 of the Federal Rules of Civil Procedure, each customer of T Edeh who suffered a loss is explicitly made an intended third-party beneficiary of this Order and may seek to enforce obedience of this Order to obtain satisfaction of any portion of the restitution that has not been paid by T Edeh to ensure continued compliance with any provision of this Order and to hold him in contempt for any violations of any provision of this Order.

## VI. MISCELLANEOUS PROVISIONS

49. Notice: All notices required to be given by any provision in this Order shall be sent certified mail, return receipt requested, as follows:

Notice to Commission:

>Richard Glaser, Deputy Director
>Commodity Futures Trading Commission
>Division of Enforcement
>1155 21st St., NW
>Washington, D.C. 20581

Notice to Defendant T. Edeh:

>Tochukwu Abel Edeh
>Register Number: 63100-509
>Federal Correctional Institution Oakdale II
>2105 East Whatley Road
>Oakdale, Louisiana 71463

Notice to NFA:

>Daniel Driscoll, Executive Vice President, COO
>National Futures Association
>300 S. Riverside Plaza, Suite 1800
>Chicago, IL 60606-3447

50. All such notices to the Commission or the NFA shall reference the name and docket number of this action.

51. Change of Address/Phone: Until such time as T Edeh satisfies in full his Restitution Obligation and CMP Obligation as set forth in this Order, he shall provide written notice to the Commission by certified mail of any change to his telephone number and mailing address within ten calendar days of the change.

52. Invalidation: If any provision of this Order or if the application of any provision or circumstance is held invalid, then the remainder of this Order and the application of the provision to any other person or circumstance shall not be affected by the holding.

53. Continuing Jurisdiction of this Court: This Court shall retain jurisdiction of this action to ensure compliance with this Order and for all other purposes related to this action, including any motion by any defendant to modify or for relief from the terms of this Order.

54. Injunctive and Equitable Relief Provisions: The injunctive and equitable relief provisions of this Order shall be binding upon T Edeh, upon any person under his authority or control, and upon any person who receives actual notice of this Order by personal service, e-mail, facsimile or otherwise insofar as he or she is acting in active concert or participation with T Edeh.

There being no just reason for delay, the Clerk of the Court is hereby ordered to enter this Order For Final Judgment By Default, Permanent Injunction, Civil Monetary Penalty, And Other

Statutory And Equitable Relief Against Defendant Tochukwu Edeh forthwith and without further notice.

IT IS SO ORDERED on this __19__ day of ____July____, 2024.

_Richard M. Stearns_
UNITED STATES DISTRICT JUDGE